HOOKER CHEMICALS & PLASTICS CORP. et al., Petitioners,

v.

Russell E. TRAIN, as Administrator, Environmental Protection Agency, Respondent.

No. 650, Docket 74–1683.

United States Court of Appeals, Second Circuit.

Argued April 25, 1975.

Decided April 28, 1976.

D. E. Kliever, Washington, D. C. (Cleary, Gottlieb, Steen & Hamilton, Washington, D. C. and New York City, of counsel, Robert C. Barnard, Henry J. Plog, Jr., Washington, D. C., on the brief), for petitioners.

Pamela Quinn, Washington, D. C. (Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Dept. of Justice, Alan G. Kirk II, Attys., Washington, D. C., on the brief), for respondent.

Before MOORE, Circuit Judge, and BRYAN and DUFFY,* District Judges.

MOORE, Circuit Judge:

This case is a companion to our accompanying decision *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (1976) ("74–1687") in which we considered the validity of regulations limiting effluent discharges by existing manufacturers of phosphorus and related chemical compounds. Petitioners in this case seek to have this Court review and set aside regulations affecting "new source" manufacturers in the same industry. A "new source" is any source of liquid effluent, the construction of which is commenced after the publication of applicable regulations.[1] The regulations establish a level of zero discharge of process waste water for all "new source" manufacturers of elemental phosphorus,[2] phosphoric acid, phosphorus pentoxide, phosphorus pentasulfide, phosphorus trichloride, phosphorus oxychloride,[3] sodium tripolyphosphate, and feed and food grade calcium phosphate.[4]

These regulations were promulgated pursuant to § 306[5] of the Federal Water Pollution Control Act Amendments, 33 U.S.C. §§ 1251 *et seq.* ("Act"). Section 306 requires that the regulations reflect

> "the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants."

Unlike the contested regulations in 74–1687 which applied to existing dischargers of liquid effluent, the regulations in this case apply only to facilities the construction of which is commenced after the regulations were published.[6] But both sets of regulations concern the same general industrial category of effluent dischargers, the phosphate and related chemical manufacturers, and both were promulgated by the Environmental Protection Agency ("EPA") simultaneously.

---

* Honorable Frederick van Pelt Bryan and Honorable Kevin T. Duffy, United States District Court Judges for the Southern District of New York, sitting by designation.

1. 33 U.S.C. § 1316(a)(2).

2. 40 C.F.R. 422.15.

3. 40 C.F.R. 422.25.

4. 40 C.F.R. 422.35.

5. 33 U.S.C. § 1316.

6. 33 U.S.C. § 1316(a)(2).

Since § 509(b)(1)(A) [7] of the Act explicitly confers jurisdiction on this Court to review regulations promulgated pursuant to § 306, we indisputably have subject matter jurisdiction and may proceed immediately to a discussion of Petitioners' arguments.

■ Petitioners divide their arguments into two categories: those addressed to the regulations as a whole, and those confined to regulations affecting the new source manufacturers of a particular chemical compound. But the nature of Petitioners' arguments does not alter the standard of review. As is true of the regulations for existing sources discussed in 74–1687, our inquiry is confined to the question of whether they are arbitrary, capricious or not otherwise in accordance in law.

We may summarily dispose of Petitioners' generic complaints. The Act requires the EPA in formulating "new source" regulations to consider (1) the cost of achieving compliance with the new source regulations; (2) the regulations' non-water quality environmental impact; and (3) energy requirements.[8] Without mentioning specific examples, Petitioners claim that the EPA sidestepped this methodological imperative. While we agree that the EPA is obligated to consider such factors during the rule-making process, whether in fact it did so is a question which is best resolved in the less abstract context of a specific regulation. Thus, we turn to specific regulations governing "new source" manufacturers of particular phosphorus-related chemicals.

Our task is considerably lightened by the EPA's concession that "new source performance standards for phosphorus trichloride, phosphorus oxychloride, food grade sodium tripolyphosphate, and food grade calcium phosphate will be reconsidered." [9] All regulations relating to the aforementioned chemical compounds are remanded to the EPA for their desired reconsideration. Only the "new source" regulations for phosphorus and phosphorus pentasulfide require further consideration.

■ The Act mandates a regulatory standard for "new source" which resembles the standard prescribed for post-1983 regulations for existing sources. The latter are based on the "best available technology economically achievable" while the former must reflect the "best available demonstrated control technology." Presumably because of the similarity, the EPA merged the promulgation of regulations for new and existing sources into one procedure using the same data base. And in its briefs, the EPA advances the same arguments to support both its "new source" regulations and its 1983 regulations for existing sources.

■ Although Petitioners intimate a contrary view, we believe that the assimilation was not objectionable *per se*. *American Iron & Steel Institute v. Environmental Protection Agency*, 526 F.2d 1027, at 1058 (3rd Cir. 1975). The two standards may not be identical (for example, the technology relied upon to formulate "new source" regulations must be "demonstrated"), but the distinctions do not require that the two types of regulation be promulgated independently. However, because of the assimilation, a rationale which is unpersuasive in the context of existing source regulations for 1983 will fare no better in the context of "new source" regulations. *Tanners' Council of America, Inc. v. Train*, 540 F.2d 1188, at 1194 (4th Cir. 1976). Consequently, the reasons which led us to set aside the 1983 effluent limitation guidelines for phosphorus producers in 74–1687 require invalidation of the "new source" regulations affecting prospective producers of that chemical. Nothing in the record supports the EPA's post hoc argument that the technology on which the new source standard was predicated is "available", let alone "demonstrated".

Petitioners particularly stress the concession by the EPA that

"In areas of the country where very severe and extended cold weather prevails,

7. 33 U.S.C. § 1369(b)(1)(A).

8. 33 U.S.C. § 1316(b)(1)(B).

9. Resp. Br. p. 16.

total recycle of process water becomes difficult for two reasons:

"1. The return water piping and pump must be protected against freezing.

2. The settling ponds may freeze . . . this circumstance would prevent the required water from being supplied back to the process." [10]

To this, the EPA responds that although freezing difficulties are "formidable" they are not "unyielding to practicable, currently available technology",[11] such as "buried water mains", "heated pumping stations", and "auxiliary fresh water supply" "to uncouple the process from frequent climatic perturbations." [12] If the latter course were adopted, the EPA cautions that "the pond system would have to consist of sufficient holding capacity to prevent temporary overflow." [13] As a final solution, EPA impliedly suggested in its brief that if the proposed construction site be too cold or without available land area, the plant be located elsewhere.[14] As we noted in 74–1687, these assertions are merely conjectural. Without knowing how large ponds (even if available) must be to prevent "temporary overflow", it is impossible to evaluate the conclusion that such technology is available. This inadequacy is particularly troubling in light of Petitioners' representation that any decision to build a "new source" is controlled by the proximity to the ore, a major deposit of which is said to be Montana and Idaho.

■ The record is also devoid of sufficient consideration of the costs of the purportedly "available" technology. Although it is undoubtedly true that installation of antipollution devices would tend to be less expensive if installed during the construction of new sources, this fact does not eliminate the necessity under § 304 for some consideration of the cost aspects. These defects as well as the other problems which are discussed more extensively in opinion 74–1687 require us to vacate the regulations and remand for further proceedings by the EPA. As to any non-water quality environmental impact and energy requirements, any prediction by us at this time would be pure speculation.

The new source standard for phosphorus pentasulfide also must be set aside. The Petitioners' challenges and the EPA's justification merely echo the debate over 1983 effluent limitation guidelines for existing producers of that chemical. That debate and our evaluation of its is set forth in opinion 74–1687, and there is no need to repeat it in its entirety. Suffice it to say that the regulation is impermissibly predicated on technology which the record does not show to be "available". We vacate and remand all regulations for further proceedings during which the EPA will be able to respond to the Petitioners' objections and to consider the factors specifically enumerated in § 306 of the Act.

10. Parties Joint Appendix ("App.") p. 1771.

