866 F.2d 1263
 29 ERC 1071, 19 Envtl. L. Rep. 20,835
 ENVIRONMENTAL DEFENSE FUND, Southwest Research & Information
Center, and Sierra Club, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents.
 No. 86-1235.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 27, 1989.
 
 Melinda Kassen, Staff Atty. (Robert E. Yuhnke, Senior Staff Atty., with her on the briefs), Environmental Defense Fund, Boulder, Colorado, for petitioners.
 E. Neil Jensen (William H. Briggs, Jr., Sol., and E. Leo Slaggie, Deputy Sol., with him on the brief), U.S. Nuclear Regulatory Commission, Washington, D.C., for respondents.
 Before LOGAN, McWILLIAMS and TACHA, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Petitioners Environmental Defense Fund, Southwest Research & Information Center, and Sierra Club challenge the United States Nuclear Regulatory Commission's (NRC's) final order establishing criteria regulating mill tailings at licensed commercial uranium and thorium processing sites (active mill sites). See 50 Fed.Reg. 41,852 (1985) (codified at 10 C.F.R. pt. 40, app. A). The NRC established these criteria pursuant to Title II of the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), Pub.L. No. 95-604, 92 Stat. 3021 (codified as amended in scattered sections of 42 U.S.C.).[1] Jurisdiction for review of final NRC orders in rulemaking proceedings lies exclusively in the United States Courts of Appeal. 42 U.S.C. Sec. 2239(b); 28 U.S.C. Sec. 2342(4).
 
 
 2
 The general issue in the instant case is how and whether the NRC, in managing active mill sites, may deviate from the Environmental Protection Agency (EPA) general standards. More specifically, petitioners argue that certain site-specific deviations, which the NRC claims it has authority to permit under Sec. 84(c) of the Atomic Energy Act (AEA), 42 U.S.C. Sec. 2114(c), are impermissible under UMTRCA and ineffective without the EPA's concurrence therein.[2]
 
 
 3
 * UMTRCA charges the EPA with the duty to promulgate general standards to protect the public health and the environment from both radiological and nonradiological hazards presented by uranium and thorium mill tailings at active sites. 42 U.S.C. Sec. 2022(b)(1); see American Mining Congress v. Thomas, 772 F.2d 640 (10th Cir.1985) (AMC II ) (upholding EPA active site regulations against several challenges), cert. denied, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986); American Mining Congress v. Thomas, 772 F.2d 617 (10th Cir.1985) (AMC I ) (reviewing EPA inactive site regulations), cert. denied, 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986). UMTRCA assigns the duty to regulate mill tailings to the NRC. 42 U.S.C. Sec. 2114(a). As part of its regulatory duty under UMTRCA, the NRC must conform its regulations to the EPA's general standards, id. Sec. 2114(a)(2), and "[i]mplement[ ] and enforce[ ]" the EPA standards. Id. Sec. 2022(d). In seeking to carry out its statutory duties under UMTRCA, in 1985 the NRC promulgated regulations, in the form of an introduction and twelve criteria (NRC or 1985 criteria), which we uphold against cost-benefit and other challenges by industrial petitioners in a companion case entered this day, Quivira Mining Co. v. NRC, 866 F.2d 1246 (10th Cir.1989). For a description of the NRC criteria, see id., at 1252-1253.
 
 
 4
 UMTRCA directs the EPA to make its general standards "consistent with the standards required under subtitle C of the Solid Waste Disposal Act [SWDA], ... as amended, which are applicable to such hazards." 42 U.S.C. Sec. 2022(b)(2).[3] In following this directive, the EPA expressly incorporated portions of the SWDA regulations in its mill tailings standards. See 48 Fed.Reg. 45,927 (1985) (EPA general standards to protect groundwater, incorporating SWDA rules); 40 C.F.R. Sec. 192.32(a)(2).
 
 
 5
 Because UMTRCA vests licensing authority over uranium mill tailing disposal sites in the NRC and requires the NRC to conform to the EPA standards, this incorporation of SWDA regulations into the EPA's general standards governing mill tailings generally allows the NRC to perform certain licensing functions otherwise performed by the EPA under the SWDA regulations. The EPA regulation, however, purports to limit the NRC's power as follows: any NRC attempt to grant an exemption of a hazardous constituent for an individual licensed site or to establish an alternate concentration limit for a hazardous constituent at such a site "shall not be effective until the EPA has concurred therein." Id. Sec. 192.32(a)(2)(v).[4]
 
 
 6
 When it promulgated its 1985 criteria, the NRC rejected any concurrence role by the EPA in the application of those criteria. This rejection was both specific, in that the NRC claimed not to be bound by the precise terms of 40 C.F.R. Sec. 192.32(a)(2)(v), and general, in that the NRC expressly denied the duty to submit any site-specific license approval that deviated from the EPA's general standards to the EPA for its concurrence. Thus, the NRC final rule states:
 
 
 7
 "Consistent with that authority and in accordance with section 84c. of that Act, the [Nuclear Regulatory] Commission has the discretion to review and approve site specific alternatives to standards promulgated by the Commission and by the Administrator of the Environmental Protection Agency. In the exercise of this authority, section 84c does not require the Commission to obtain the concurrence of the Administrator in any site specific alternative which satisfies Commission requirements for the level of protection for public health, safety, and the environment from radiological and nonradiological hazards at uranium mill tailings sites. As an example, the Commission need not seek concurrence of the Administrator in case-by-case determinations of alternative concentration limits and delisting of hazardous constituents for specific sites."
 
 
 8
 NRC Final Rule, Uranium Mill Tailings Regulations, 50 Fed.Reg. 41,852, 41,861 (1985); see also id. at 41,853-55.
 
 
 9
 Two issues are presented in this case. First, does the NRC have the power to issue a license that does not comply with every aspect of the EPA's general standards? Second, if the NRC does have such power, is EPA concurrence required to validate any such license granted by the NRC?
 
 II
 
 10
 Our standard of review, as we hold today in Quivira Mining, is that set out in the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701-06. The APA allows the notice and comment rulemaking at issue here to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. Sec. 706(2)(A). In this case, we must decide whether the NRC's interpretation of UMTRCA satisfies this standard. In Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set forth the proper analysis to determine whether an administrative regulation permissibly construes the statute the agency is charged with enforcing:
 
 
 11
 "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."
 
 
 12
 Id. at 842-43, 104 S.Ct. at 2781 (footnotes omitted).
 
 III
 
 13
 The debate over the NRC's power to approve a site-specific license not in strict compliance with the EPA's general standards focuses on Sec. 84(c) of the AEA, 42 U.S.C. Sec. 2114(c). This section, which was added as Sec. 20 of the 1982 NRC Authorization, Pub.L. No. 97-415, 96 Stat.2067, 2079 (1983), provides:
 
 
 14
 "In the case of sites at which ores are processed primarily for their source material content or which are used for the disposal of byproduct material as defined in section 2014(e)(2) of this title, a licensee may propose alternatives to specific requirements adopted and enforced by the Commission under this chapter. Such alternative proposals may take into account local or regional conditions, including geology, topography, hydrology and meteorology. The Commission may treat such alternatives as satisfying Commission requirements if the Commission determines that such alternatives will achieve a level of stabilization and containment of the sites concerned, and a level of protection for public health, safety, and the environment from radiological and nonradiological hazards associated with such sites, which is equivalent to, to the extent practicable, or more stringent than the level which would be achieved by standards and requirements adopted and enforced by the Commission for the same purpose and any final standards promulgated by the Administrator of the Environmental Protection Agency in accordance with section 2022 of this title."
 
 
 15
 Petitioners focus on the language that "a licensee may propose alternatives to specific requirements adopted and enforced by the Commission," and that the "Commission may treat such alternatives as satisfying Commission requirements." (emphasis added). Petitioners assert that this language means that a licensee's alternatives are limited solely to alternatives to the NRC regulations, that is, that Congress did not intend the NRC to be able to approve alternatives inconsistent with the EPA's general standards.
 
 
 16
 In making this argument, petitioners rely on other sections of UMTRCA, the history of regulation of radioactive material generally, and the legislative history of AEA Sec. 84(c). First, petitioners point to the history of environmental regulations and UMTRCA. They note that when the EPA was established in 1970, the NRC's (then the Atomic Energy Commission's) former function of establishing "generally applicable environmental standards for the protection of the general environment from radioactive material" was transferred to the EPA, Reorganization Plan No. 3 of 1970, Sec. 2(a)(6), 35 Fed.Reg. 15,623 (1970), reprinted in 5 U.S.C.A. app. 1 at 89, 91 (West Supp.1988), and that the NRC was to "retain responsibility for the implementation and enforcement of radiation standards through its licensing authority," Message of the President Accompanying Reorganization Plans Nos. 3 & 4 of 1970, reprinted in 1970 U.S.Code Cong. & Admin.News 6322, 6329, 6331. Petitioners assert that this plain language intended a specific division of labor between the EPA and the NRC; the EPA was to draft "generally applicable environmental standards," and the NRC was limited to implementing and enforcing these standards. Petitioners further claim that UMTRCA follows a "parallel framework" to the reorganization plan, and that the historical division of authority between the agencies accordingly prevents the NRC from exempting any licensee from any aspect of the EPA standards. Here, petitioners point to UMTRCA's requirements that the EPA promulgate "standards of general application," 42 U.S.C. Sec. 2022(b), and that the NRC amend and modify its 1980 Criteria "as the Commission deems necessary to conform" to the EPA's general standards. Id. Sec. 2022(f)(3). This conformance duty also appears in 42 U.S.C. Sec. 2114(a)(2), which describes the NRC's authority respecting mill tailings.[5] Petitioners argue that the command that the NRC "conform" to the EPA requirements denies the NRC any site-specific exemption power.
 
 
 17
 Finally, petitioners point to the legislative history of Sec. 84(c) itself. In particular, they argue that Sec. 84(c) was, in effect, an afterthought; that Congress' primary intent was to allow "agreement states"[6] greater flexibility in implementing the NRC's regulations by enacting Sec. 19(a) of the 1982 NRC Authorization, which amended AEA Sec. 274(o ), 42 U.S.C. Sec. 2021(o ).[7] They note that the language of Sec. 19(a) closely parallels Sec. 20 of the same act, which became Sec. 84(c) of the AEA. They cite several passages from the legislative history to Sec. 19(a) to show that Congress focused solely on allowing site-specific exemptions by the NRC from its own criteria and not from the EPA's general standards. For example, the Conference Report describes Sec. 19 as authorizing agreement states "to adopt alternatives (including site-specific alternatives) to the Commission's regulations." H.R.Conf.Rep. No. 884, 97th Cong.,2d Sess. 48, reprinted in 1982 U.S.Code Cong. & Admin.News 3592, 3603, 3618 (hereinafter Conference Report); see also 128 Cong.Rec. Sec. 13052 (daily ed. Oct. 1, 1982) (statement of Sen. Simpson that one purpose of 1982 amendments is to allow agreement states to adopt alternatives to NRC requirements). By referring explicitly to alternatives to NRC requirements, petitioners read this language implicitly to forbid alternatives to EPA standards.
 
 
 18
 Although petitioners' interpretation of Sec. 84(c) is not unreasonable, under the standard of review set out in Chevron we must reject it. As the NRC points out, UMTRCA requires it to "adopt" modifications to its 1980 criteria and to conform the modified criteria to the EPA's general standards, 42 U.S.C. Sec. 2022(f)(3), and further charges the NRC with "enforc[ing]" the EPA's requirements, 42 U.S.C. Sec. 2022(d). The NRC thus asserts that Sec. 84(c)'s reference to requirements "adopted and enforced" by the NRC may be read to encompass both the EPA standards and the NRC regulations. Further, the NRC reads the phrase "Commission requirements" in Sec. 84(c) to refer not just to the NRC's criteria but also as shorthand for the earlier reference to "standards adopted and enforced by the Commission," again reading "adopted and enforced" standards to include the EPA's standards. Most important, the NRC correctly notes that petitioners overlook that part of Sec. 84(c) allowing the NRC to treat site-specific alternatives as satisfying its requirements when a proposed alternative is "equivalent to, to the extent practicable ... the level which would be achieved by standards and requirements adopted and enforced by the Commission for the same purpose and any final standards promulgated by [the EPA] in accordance with section 2022 of this title." (emphasis added). If the NRC is empowered to approve only licenses that are equivalent to the EPA standards, this part of Sec. 84(c) makes little sense. If the NRC had no power to grant a variance from the EPA standards, literal compliance with those standards, rather than compliance "to the extent practicable," would be the expected statutory wording. The inclusion of "to the extent practicable," strongly favors the NRC's reading of Sec. 84(c).
 
 
 19
 Further, even granting that Sec. 84(c) may be read in two ways, under Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781, we find the NRC's construction of the statute permissible and not contrary to a clear expression of Congress' intent. In addition, petitioners' statutory and historical arguments do not directly address the question presented. First, that UMTRCA requires the NRC to "conform" to the EPA's general standards does not address what the NRC is to do when such conformance is impracticable at a given site. Section 84(c) addresses just this question, and that section on its face admits of the NRC's construction. Second, petitioners' argument from the legislative history, especially their focus on Sec. 19(a) of the 1982 NRC Authorization, in the end proves too much. Even if Sec. 84(c) was an afterthought based on Sec. 19(a) of the 1982 amendments, Sec. 19(a) does not add anything to petitioners' construction of Sec. 84(c). Section 19(a) contains the same "Commission requirements" and "to the extent practicable" phrases present in Sec. 84(c), which admit of the reading advocated by the NRC. We therefore reject petitioners' claim, and hold that AEA Sec. 84(c) permits the NRC to approve, when the contrary is not practicable, licensee-proposed site-specific alternatives that are less stringent than the EPA general standards.
 
 IV
 
 20
 Having determined that Sec. 84(c) permits the NRC to grant site-specific licenses that do not meet the letter of the EPA general standards, we must now address whether the NRC must obtain the EPA's concurrence before granting such a license. Petitioners' argument here is three-fold: first, they assert that this question was effectively decided in the EPA's favor by AMC II and, thus, is not now open for relitigation. Second, petitioners argue that by failing to challenge the EPA regulation codified at 40 C.F.R. Sec. 192(a)(2)(v) within sixty days of its promulgation, the NRC is precluded from challenging it now. Third, petitioners contend that under UMTRCA EPA concurrence is required to validate any exemptions or exceptions to the EPA general regulations which the NRC grants.
 
 
 21
 We do not agree that our approval in AMC II of the EPA active site regulations, including the concurrence provision in 40 C.F.R. Sec. 192.32(a)(2)(v), operates as a bar to any NRC action inconsistent with the EPA regulation absent EPA approval. Our review in AMC II neither specifically addressed Sec. 192.32(a)(2)(v) nor considered whether UMTRCA required the NRC to submit any nonconforming licensing decisions to the EPA for its concurrence. Thus, collateral estoppel (issue preclusion) does not prevent the NRC, as part of the federal executive branch, cf. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-03, 60 S.Ct. 907, 916-17, 84 L.Ed. 1263 (1940), from litigating the question.
 
 
 22
 We also do not agree that the NRC's failure to seek review of the EPA regulation within sixty days of its issuance precludes our review now. Although AEA Sec. 275(c)(2), 42 U.S.C. Sec. 2022(c)(2), does indeed require that challenges to regulations be brought within sixty days of their promulgation, this argument misses the point. NRC regulations, not those of the EPA, are now under review; although we must resolve a conflict between regulations, the timeliness bar of Sec. 2022(c)(2) as applied to the EPA regulation does not bar our review of the NRC regulation in this case.
 
 
 23
 Petitioners' third argument, that UMTRCA requires that the NRC obtain the concurrence of the EPA before approving a site-specific exception or exemption, is tied directly to their argument, which we rejected ante, that such exceptions or exemptions are beyond the NRC's statutory authority. We found no section of UMTRCA, and petitioners direct us to none, that requires the NRC, before granting an AEA Sec. 84(c) site-specific license exception or exemption, to obtain prior EPA concurrence. While obtaining such a concurrence may often be prudent in light of the EPA's expertise in the technical and legal details of environmental regulation, UMTRCA does not require it. Absent an express congressional command, we will not add a concurrence duty with which the NRC must comply.
 
 V
 
 24
 In conclusion, we reject petitioners' challenges, but we emphasize the limits of our holdings. We hold only that AEA Sec. 84(c), 42 U.S.C. 2114(c), allows the NRC to approve licenses containing site-specific alternatives to the EPA's general standards; that the power to approve such licenses exists when literal compliance with the EPA's general standards is not practicable; and that in approving such licenses the NRC need not obtain the EPA's concurrence. We do not here authorize the NRC, under Sec. 84(c), to approve licenses deviating from the EPA's general standards when compliance with those standards would be practicable. The NRC is not free to ignore or merely pay lip service to those standards. The NRC has the clear statutory duty to "conform" its criteria to the EPA's general standards, 42 U.S.C. Secs. 2022(f)(3), 2114(a)(2), and to implement and enforce those standards, id. Sec. 2022(d). We assume and expect that the NRC will act consistently with these duties. Power Reactor Dev. Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 415-16, 81 S.Ct. 1529, 1539, 6 L.Ed.2d 924 (1961).
 
 
 25
 We AFFIRM the 1985 criteria against the challenges raised herein.
 
 
 
 [1]
 Title II of UMTRCA amended Secs. 83, 84, 161, 274 and 275 of the Atomic Energy Act of 1954, 42 U.S.C. Sec. 2011 et seq
 
 
 [2]
 Originally, petitioners also sought mandamus in this action to compel the NRC to issue groundwater regulations fully conforming to EPA's general standards. This issue, however, was dismissed without prejudice on petitioners' motion in our Order on Dec. 23, 1987
 
 
 [3]
 The Solid Waste Disposal Act (SWDA) as amended, 42 U.S.C. Secs. 6921-31, requires all hazardous waste disposal sites to be licensed by the EPA pursuant to EPA standards for the treatment, storage, and disposal of hazardous wastes. 42 U.S.C. Sec. 6925
 
 
 [4]
 40 C.F.R. Sec. 192.32(a)(2)(v) provides in full:
 "The functions and responsibilities designated in Part 264 of this chapter as those of the 'Regional Administrator' with respect to 'facility permits' shall be carried out by the regulatory agency, except that exemptions of hazardous constituents under Sec. 264.93(b) and (c) of this chapter and alternate concentration limits established under Sec. 264.94(b) and (c) of this chapter (except as otherwise provided in Sec. 192.32(a)(2)(iv)) shall not be effective until the EPA has concurred therein."
 
 
 [5]
 Section 2114(a)(2) provides as follows:
 "The Commission shall insure that the management of [mill tailings] is carried out in such manner as--
 * * *
 (2) conforms with applicable general standards promulgated by the Administrator of the Environmental Protection Agency under section 2022 of this title...."
 
 
 [6]
 Under AEA Sec. 274, 42 U.S.C. Sec. 2021, the NRC is authorized to enter into agreements with state governors giving the states authority to regulate aspects of uranium or thorium mill tailings
 
 
 [7]
 Section 19(a) added the following language to the end of AEA Sec. 274(o ):
 "In adopting requirements pursuant to paragraph (2) of this subsection with respect to sites at which ores are processed primarily for their source material content or which are used for the disposal of byproduct material as defined in section 2014(e)(2) of this title, the State may adopt alternatives (including, where appropriate, site-specific alternatives) to the requirements adopted and enforced by the Commission for the same purpose if, after notice and opportunity for public hearing, the Commission determines that such alternatives will achieve a level of stabilization and containment of the sites concerned, and a level of protection for public health, safety, and the environment from radiological and nonradiological hazards associated with such sites, which is equivalent to, to the extent practicable, or more stringent than the level which would be achieved by standards and requirements adopted and enforced by the Commission for the same purpose and any final standards promulgated by the Administrator of the Environmental Protection Agency in accordance with section 2022 of this title. Such alternative State requirements may take into account local or regional conditions, including geology, topography, hydrology and meteorology."